Nos. 16–2180 and 16–2228

IN THE

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CX Reinsurance Company Limited,
formerly known as CNA Reinsurance Company Limited,

*Plaintiff–Appellee/Cross–Appellant*,

v.

Brayon J. Loyal,

*Defendant–Appellant/Cross–Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF MARYLAND
No. 1:15–cv–02174–JKB
(HON. JAMES K. BREDAR)

**Brief of Appellee/Cross–Appellant CX Reinsurance Company Limited**

Stuart M.G. Seraina
Louis P. Malick
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030
sseraina@kg-law.com
lmalick@kg-law.com

*Counsel for Appellee/Cross–Appellant*
*CX Reinsurance Company Limited*

## Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Appellee/Cross-Appellant CX Reinsurance Company Limited states that: it is not a publicly held corporation or entity; it has no parent corporations; no publicly held corporation or entity owns 10 percent or more of its stock; no publicly held corporation or entity has a direct financial interest in the outcome of this litigation; it is not a trade association; and this case does not arise out of a bankruptcy proceeding.


/s/    *Stuart M.G. Seraina*
Stuart M.G. Seraina

*Counsel for Appellee/Cross-Appellant*
*CX Reinsurance Company Limited*

# Table of Contents

**Corporate Disclosure Statement**............................................................i

**Table of Authorities** ........................................................................iv

**Jurisdictional Statement**...................................................................1

**Issues Presented for Review** ............................................................1

I.  Did the district court properly enter summary judgment in favor of CX Re after construing unambiguous terms in an insurance policy and finding that, as a matter of law, the policy provided no coverage for Loyal's claims?

II. In the event this Court does not affirm the district court's entry of summary judgment, where the insurance policy at issue had been rescinded as void *ab initio* by agreement with CX Re's insured in a separate action, did the district court abuse its discretion in denying CX Re's request to dismiss the declaratory action on the ground that it was, therefore, moot?

**Statement of the Case** .....................................................................2

**Summary of Argument**....................................................................6

**Standards of Review** .......................................................................7

**Argument** .......................................................................................8

I.  The district court properly entered summary judgment in CX Re's favor ..........8

    A. CX Re's policies could potentially cover Loyal's claims against Levitas only if an exception to an exclusion of coverage applies ......................................9

    B. If the insurer establishes that a claimed loss is excluded, the burden shifts to the insured to show an exception to that exclusion .....................................11

    C. Neither Section II(.a) of the lead contamination endorsement nor the endorsement as a whole was an "independent insuring agreement" .............19

    D. The burden here ultimately shifted to Levitas to show that an exception to the lead contamination exclusion applied, and neither Levitas nor Loyal met (or could meet) that burden .......................................................................21

        1. Levitas can carry State Real Estate's initial burden to show the claim is covered under the policies' insuring agreement ......................................22

        2. CX Re carried its burden of showing that the lead contamination endorsements in the policies exclude coverage for Loyal's claims against Levitas .........................................................................................22

        3. Levitas (and Loyal) could not and did not carry the burden of showing that an exception to the exclusion applies ...............................................23

4.  If no exception to the exclusion applies, CX Re's policies do not provide coverage to Levitas against Loyal's claims ...............................................24

E.  The district court construed the plain terms of Section II(b) of the lead contamination endorsement in the only reasonable way ...............................24

F.  The district court construed the plain terms of the definition of "safe level" in the only reasonable way ........................................................................27

G.  As the policy terms are unambiguous, extrinsic evidence – including expert testimony – is inadmissible, and discovery would have been pointless .......31

H.  A state trial court's decision in an unrelated case is not relevant .................35

II.  The district court should have granted CX Re's request for dismissal ..............38

A.  The action became moot when the insurance policies were rescinded .........38

B.  Loyal was not an intended third-party beneficiary and, therefore, had no standing to enforce the insurance policies CX Re issued to State Real Estate ......................................................................................................................39

C.  As Loyal was not an intended third-party beneficiary and had no right to enforce the policies, the precise nature of the rescission was irrelevant .......42

D.  The district court abused its discretion in grounding its decision on the absence of evidence of an irrelevant fact ......................................................42

E.  The fact that Loyal obtained a judgment against the insured after the policies were rescinded as void *ab initio* changes nothing .........................................43

F.  The district court properly rejected Loyal's other arguments.......................46

**Conclusion**.................................................................................................................47

**Certificate of Compliance**......................................................................................48

**Text of Pertinent Rules** .........................................................................................49

**Certificate of Service** .............................................................................................50

# Table of Authorities

## Cases

*120 West Fayette St., LLP v. Mayor & City Council of Baltimore*,
426 Md. 14 (2012) ....................................................................39, 40

*Aeroquip Corp. v. Aetna Cas. & Sur. Co.*, 26 F.3d 893 (9th Cir. 1994) ...............13

*Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98 (1995) ...........................................8

*ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789 (D. Md. 2008)..11, 22

*Alcolac, Inc. v. St. Paul Fire & Marine Ins. Co.*, 716 F. Supp. 1541
(D. Md. 1989) ...............................................................................34

*Am. W. Home Ins. Co. v. Lovedy*, No. 06-8, 2006 WL 3740874 (E.D. Tenn.
Dec. 15, 2006)...............................................................................14

*Amos ex rel. Amos v. Campbell*, 593 N.W.2d 263 (Minn. Ct. App. 1999) .............13

*Ass'n of Apt. Owners of Imperial Plaza v. Fireman's Fund Ins. Co.*,
939 F. Supp. 2d 1059 (D. Haw. 2013)................................................16

*Bao v. Liberty Mut. Fire Ins. Co.*, 535 F. Supp. 2d 532 (D. Md. 2008)......11, 17, 22

*Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596 (4th Cir. 2002) ...............................7

*Brohawn v. Transamerica Ins. Co.*, 276 Md. 396 (1975)..................................8, 22

*Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.*, 791 A.2d 489 (Conn. 2002) ........13

*Calomiris v. Woods*, 353 Md. 425 (1999)................................................................34

*Chemetron Invs., Inc. v. Fid. & Cas. Co. of N.Y.*, 886 F. Supp. 1194
(W.D. Pa. 1994) ...............................................................................15

*Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761 (1989) .....................................9, 31

*Cont'l Ins. Co. v. Beecham, Inc.*, 836 F. Supp. 1027 (D.N.J. 1993) .......................15

*CX Reinsurance Co. Ltd. v. Camden Mgmt. Servs., LLC*, No. WMN-14-180,
2014 WL 5510914 (D. Md. Oct. 30, 2014) ........................................ 16-17, 37

*CX Reinsurance Co. Ltd. v. Heggie*, No. ELH-15-1674, 2016 WL 6025488
(D. Md. Oct. 14, 2016)................................................................ 17-18, 37

*Davis v. USX Corp.*, 819 F.2d 1270 (4th Cir. 1987)..........................................8, 43

*Dep't of Health & Mental Hygiene v. Dillman*, 116 Md. App. 27 (1997)..............36

*Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718
(2007)...............................................................................................32

*Dickerson v. Longoria*, 414 Md. 419 (2010) .........................................................44

*Duncan v. Cuna Mut. Ins. Soc'y*, 614 S.E.2d 592 (N.C. Ct. App. 2005)................13

*E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059 (Del. 1997)...13

*E.I. du Pont de Nemours & Co v. Admiral Ins. Co.*, 711 A.2d 45
(Del. Super. Ct. 1995) ........................................................................15

*Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72 (1997)..9

*Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720
(5th Cir. 1999)...................................................................................13

*Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238
(4th Cir. 1987)...................................................................................33

*Gilbert Texas Constr., L.P. v. Underwriters at Lloyd's London*,
327 S.W.3d 118 (Tex. 2010) ......................................................13, 14

*Harford County v. Harford Mut. Ins. Co.*, 327 Md. 418 (1992) ............................12

*Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 594 S.E.2d 455 (S.C. 2004) .13

*Higdon v. Lincoln Nat'l Ins. Co.*, No. ELH-13-2152, 2014 WL 6951290
(D. Md. Dec. 8, 2014) .......................................................................45

*Hill v. Trustees of Indiana Univ.*, 537 F.2d 248 (7th Cir. 1976) .............................35

*Howell v. Harleysville Mut. Ins. Co.*, 305 Md. 435 (1986) ...................................27

*Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405 (2014) ..........................32

*In re Naranjo*, 768 F.3d 332 (4th Cir. 2014) ..........................................................43

*John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*,
415 Md. 313 (2010) .................................................................... 34-35

*Julian v. Buonassissi*, 414 Md. 641 (2010)...................................................... 44-45

*Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 840 F. Supp. 390 (W.D. Pa. 1993) ...14

*LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511 (11th Cir. 1997) ..............13

*Landmark Realty, Inc. v. Great Am. Ins. Co.*, No. JKS-10-278,
2010 WL 5055805 (D. Md. Dec. 3, 2010).........................................17

*League of Women Voters of N.C. v. N.C.*, 769 F.3d 224 (4th Cir. 2014) ...............43

*Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153 (4th Cir. 1992)........36

*Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636 (2012),
*aff'd* 432 Md. 292 (2013) ..................................................................41

*Lovell Land, Inc. v. State Highway Admin.,* 408 Md. 242 (2009) ..........................40

*MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261 (2003)............... 9, 31-32

*Marlboro Shirt Co. v. Am. Dist. Tel. Co.*, 196 Md. 565 (1951) .............................40

*Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118
(2d Cir. 2012)....................................................................................15

*Millennium Inorganic Chems. Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 744 F.3d 279 (4th Cir. 2014) ...................................................7

*Modern Equip. Co. v. Cont'l W. Ins. Co.*, 355 F.3d 1125, 1128 (8th Cir. 2004).....13

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. The Fund for Animals, Inc.*, ___Md. ___, No. 18, Sept. Term, 2016, 2017 WL 383453 (Jan. 27, 2017).......11

*Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 183 Md. App. 710 (2009)...29

*Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674 (D. Md. 2013)..........31

*New Castle County v. Hartford Accident & Indem. Corp.*, 933 F.2d 1162 (3d Cir. 1991)...............................................................................................15

*N.Y. v. Blank*, 27 F.3d 783 (2d Cir. 1994) .............................................................15

*N. Ins. Co. of N.Y. v. Aardvark Assocs., Inc.*, 942 F.2d 189 (3d Cir. 1991) ......14, 15

*Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 679 N.E.2d 1044 (N.Y. 1997).......................................................... 12-13, 15, 18

*Parlette v. Parlette*, 88 Md. App. 628 (1991)..........................................................40

*Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 197 F. Supp. 2d 370 (D. Md. 2002)....................................................................11

*Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403 (4th Cir 2010) .....................17

*Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003) ..............................................8

*Ruede v. City of Florence*, 220 P.3d 113 (Or. Ct. App. 2009) ................................16

*Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339 (7th Cir. 2010)................................................................................... 15-16

*Shillman v. Hobstetter*, 249 Md. 678 (1968) ...............................................40, 41, 42

*Simkins Indus., Inc. v. Lexington Ins. Co.*, 42 Md. App. 396 (1979) .......... 12-12, 16

*St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187 (1981)...........................8

*TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900 (Pa. Commw. Ct. 2004) ..............14

*Travelers Cas. & Sur. Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469 (Mont. 2005)........................................................................13

*Travelers Ins. Co. v. Godsey*, 260 Md. 669 (1971) .......................................... 43-44

*U.S. v. Juvenile Male*, 564 U.S. 932 (2011) ...........................................................39

*U.S. Fid. & Guar. Co. v. Morrison Grain Co.*, 734 F. Supp. 437 (D. Kan. 1990)..16

*Volcjak v. Wash. County Hosp. Ass'n*, 124 Md. App. 481 (1999)..........................41

*Weems v. Nanticoke Homes, Inc.*, 37 Md. App. 544 (1977)...................................41

*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999)..........................................................37

*W. Md. R. Co. v. Blue Ridge Hotel Co.*, 102 Md. 307, 62 A. 351 (1905) ...............45

*Young Sook Pak v. Alea London Ltd.*, No. 08-0824, 2009 WL 2366549
   (M.D. Pa. July 30, 2009)...................................................................................14

**Statutes**

28 U.S.C. § 1332 ................................................................................................1

28 U.S.C. § 1291 ................................................................................................1

**Rules**

Fed. R. Civ. P. 41 ..............................................................................................8

Fed. R. Civ. P. 56 ..............................................................................................7

Fed. R. Evid. 702 .......................................................................................19, 33

Fed. R. App. P. 4 ...............................................................................................1

**Other Authorities**

19 G. Couch, *Couch on Insurance* 2d § 79.385 (1983)..........................................13

19 C.A. Wright & A.R. Miller, *Federal Practice and Procedure* § 4507
   (3d ed. 2016).................................................................................................37

Restatement (Second) of Contracts § 7 (1981).......................................................45

## Jurisdictional Statement

The district court had subject matter jurisdiction over this declaratory judgment action pursuant to 28 U.S.C. § 1332(a)(2) because of the diversity of citizenship between the plaintiff, CX Reinsurance Company Limited ("CX Re"), a citizen of the United Kingdom, and the defendants, Stewart J. Levitas ("Levitas") and Brayon J. Loyal ("Loyal"), citizens of Maryland, and because the amount in controversy exceeds $75,000, exclusive of interest and costs. JA.228-29.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the parties have appealed from a final judgment disposing of all claims against all parties. The district court entered an order on September 15, 2016 entering judgment in favor of CX Re and "against Defendants." JA.344. Loyal appealed on October 7, 2016, and CX Re cross-appealed on October 21, 2016. JA.344-47. Fed. R. App. P. 4(a)(3).

## Issues Presented for Review

I.      Did the district court properly enter summary judgment in favor of CX Re after construing unambiguous terms in an insurance policy and finding that, as a matter of law, the policy provided no coverage for Loyal's claims?

II.     In the event this Court does not affirm the district court's entry of summary judgment, where the insurance policy at issue had been rescinded as void *ab initio* by agreement with CX Re's insured in a separate action, did the district

court abuse its discretion in denying CX Re's request to dismiss the declaratory action on the ground that it was, therefore, moot?

## Statement of the Case

On July 24, 2015, CX Re brought this action against Levitas,[1] its insured, and Loyal, the plaintiff in the underlying lead paint litigation ("the lead paint action") against Levitas. JA.228-29. CX Re asked the district court to declare that it had no duty to defend or obligation to indemnify Levitas against Loyal's claims. JA.235-36.

Loyal alleged in the lead paint action that she lived at 809 North Rose Street in Baltimore, Maryland, "from approximately 1998 to approximately May, 1999," and that Levitas "managed, maintained, operated and controlled" the property. JA.230. Loyal alleged that she was exposed to lead-based paint at the property and suffered injury as a result. *Id.* She filed the lead paint action in the Circuit Court for Baltimore City claiming negligence and unfair trade practices. JA.230-31.

Levitas tendered the lead paint action to CX Re in October 2014. JA.231. He sought coverage under two commercial general liability policies covering August 1, 1997 to August 1, 1998 and August 1, 1998 to August 1, 1999, respectively. *Id.* The policies were issued to State Real Estate, Inc., and Levitas was a named insured. *Id.* The policies cover liability for "bodily injury" that (1) "is caused by an

---

[1] As Loyal had done in the lead paint action, CX Re sued Levitas individually and as trustee of the assets of State Real Estate, Inc. JA.22, 227.

'occurrence' that takes place in the 'coverage territory'" and (2) "occurs during the policy period." JA.59.

But, the policies include an endorsement titled "COVERAGE LIMITATION – LEAD CONTAMINATION" that excludes coverage for:

> (3) "Bodily injury" … arising out of the ingestion, inhalation, absorption of, or exposure to, lead, lead-paint or other lead-based products of any kind, form or nature whatsoever.

JA.56. Nevertheless, the endorsement provides limited coverage under a narrow exception to the broad exclusion of coverage for claims arising out of lead-based products:

> (a.) Exclusion (3) above does not apply to and we will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" arising out of the Ingestion, Inhalation, absorption of, or exposure to lead, lead-paint or other lead-based products of any kind form or nature whatsoever to which the Insurance provided by this endorsement applies. …

JA.56. The endorsement further provides:

> (b.) This Insurance applies to "bodily injury" and "property damage" only if:
>    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>    (2) The "occurrence" is not before the beginning of the Policy Period shown in the Declarations of this policy; and
>    (3) The "property damage" first occurs during this policy period; or

> (4) For "bodily injury" a lead level in blood, bone or body tissue in excess of the "safe level" is first diagnosed by a State licensed physician or other State licensed health care provider during this policy period[.]

JA.57. The endorsement defines "safe level" as "10 micrograms of lead per deciliter of blood as prescribed by the Centers for Disease Control." JA.58.

Loyal produced no evidence that she had been first diagnosed with a lead level greater than 10 micrograms of lead per deciliter of blood during the policy period. To the contrary, in her answers to interrogatories in the lead paint action, which she submitted in support of her cross-motion for summary judgment in this action, Loyal stated that she exhibited blood lead levels of "3" in 1996 and "6" in 1998, JA.180, and that she "was found to have blood lead levels in excess of 5 μg/dL" during the time she resided at the property. JA.184.

On June 16, 2015, CX Re disclaimed any obligation to defend or indemnify Levitas in connection with Loyal's claims, as the policies generally excluded coverage for claims alleging bodily injury caused by lead exposure. JA.233. Still, CX Re continued to contribute to Levitas' defense of the lead paint action, subject to a full reservation of rights. JA.233.

On July 24, 2015, CX Re promptly filed the instant declaratory action. JA.2. Levitas defaulted and did not participate in the case. JA.2.

On October 30, 2015, CX Re brought a separate action against Levitas in the district court stating claims for rescission and fraud. *CX Reinsurance Co. Ltd. v.*

*Stewart J. Levitas, Individually and as Trustee of the Assets of State Real Estate*, No. 1:15-cv-03326-JFM ("the rescission action"). JA.265. CX Re alleged that State Real Estate had not disclosed in its application for insurance prior lead paint violations at properties listed on a schedule of insured locations, and that CX Re would not have issued the policies, or would have insisted on materially different terms or higher premiums, had those violations been disclosed. JA.265.

The rescission action was settled by an agreement rescinding the policies CX Re had issued to State Real Estate as void *ab initio*. JA.266. The court approved the parties' stipulation of dismissal and the rescission action was dismissed on July 13, 2016.

Because of the rescission of the policies, they provided no coverage for any claim, including Loyal's. The declaratory action accordingly was moot.  On July 18, 2016, CX Re therefore moved to dismiss this action pursuant to Fed. R. Civ. P. 41(a)(2). JA.264-66. . JA.266.

On September 15, 2016, without a hearing, the court issued an opinion. JA.331-43. The court denied CX Re's motion to dismiss because, notwithstanding the court's rejection of all of Loyal's arguments against dismissal, JA.334-38, the court found insufficient evidence in the record of the basis for the policies' rescission. JA.335. The court, however, granted CX Re's motion for summary judgment. In doing so, the court rejected Loyal's construction of the policy terms as

"strained" and not "giving effect to a contract's plain and ordinary meaning." JA.341. The court found that Loyal "proffered no evidence that she was first diagnosed with a blood lead level greater than 10 micrograms per deciliter during the [policy periods]." JA.342-43. The court granted CX Re leave to file an amended complaint, granted CX Re's motion for summary judgment, denied Loyal's cross-motion for summary judgment, denied CX Re's motion to dismiss, and entered judgment in favor of CX Re "against Defendants." JA.344.

## Summary of Argument

This Court should affirm the district court's entry of summary judgment in favor of CX Re. Under the plain language of their unambiguous terms, CX Re's insurance policies do not cover Loyal's claims against Levitas. CX Re met its burden of showing that the lead contamination endorsement excluded coverage. The burden then shifted to Levitas to show that an exception to that exclusion applied. Levitas (and Loyal) failed to do so, because Loyal was not first diagnosed with a lead level in excess of 10 micrograms per deciliter of blood during one of the two policy periods at issue here. In fact, she was never diagnosed with lead levels greater than 6 micrograms per deciliter. The district court applied the only reasonable construction of the policy terms. On these undisputed facts, no reasonable factfinder could find that CX Re was obligated to defend or indemnify Levitas against Loyal's claims.

Alternatively, in the event this Court finds the district court's entry of summary judgment improper, the Court should reverse the denial of CX Re's request for dismissal. As the insurance policies had been rescinded as void *ab initio*, they no longer provided Levitas with coverage against any claims, including Loyal's. The district court agreed that Loyal could not enforce the insurance contracts, because she was not a third-party beneficiary, but nonetheless denied CX Re's motion to dismiss because of insufficient evidence of the insurance contracts' unenforceability. As Loyal had no standing to challenge the rescission, the nature or proof of the policies' unenforceability was irrelevant. The district court's decision was, therefore, legally erroneous and an abuse of discretion.

## Standards of Review

This Court reviews *de novo* a district court's decision to grant summary judgment under Fed. R. Civ. P. 56, "construing all facts and reasonable inferences in favor of the non-moving party." *Millennium Inorganic Chems. Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 744 F.3d 279, 285 (4th Cir. 2014). Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Battle v. Seibels Bruce Ins. Co.*, 288 F.3d 596, 603 (4th Cir. 2002).

On cross-motions, "the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

The Court reviews for abuse of discretion a district court's decision not to grant a request for dismissal under Fed. R. Civ. P. 41(a)(2), considering the Rule's purpose "is freely to allow voluntary dismissals unless the parties will be unfairly prejudiced." *Davis v. USX Corp.*, 819 F.2d 1270, 1273 (4th Cir. 1987).

## Argument

### I.  The district court properly entered summary judgment in CX Re's favor.

The district court correctly granted CX Re's motion for summary judgment and denied Loyal's cross-motion. This Court should affirm that decision.

Under Maryland law, "[t]he obligation of an insurer to defend its insured under a contract provision … is determined by the allegations in the tort actions." *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 407 (1975). Determining whether an insurer has a duty to defend is a two-step process. First, the Court reviews the policy to determine the scope of coverage, including any limitations or exclusions. *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 292 Md. 187, 193 (1981); *Aetna Cas. & Sur. Co. v. Cochran*, 337 Md. 98, 103-04 (1995). Second, the Court determines, based on the allegations in the underlying complaint, whether the underlying claims would potentially be covered under the policy. *Id.*

Maryland does not follow the rule that an insurance policy "is to be construed most strongly against the insurer." *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766 (1989). Rather, insurance policies are interpreted "like any other contract" when determining the scope and limitations of coverage. *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279 (2003). "If the terms are unambiguous, the court may construe the insurance contract as a matter of law." *Id.* "When examining the language of the policy, an 'ordinarily and usually accepted' meaning should be accorded to the text[.]" *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97 (1997). When the parties do not dispute the terms of the insurance policy, but only whether the terms provide coverage to the insured, the court may decide the issue as a matter of law. *Id.*

## A. CX Re's policies could potentially cover Loyal's claims against Levitas only if an exception to an exclusion of coverage applies.

The policies that CX Re issued to State Real Estate cover "bodily injury" that "is caused by an 'occurrence' that takes place in the 'coverage territory'" and "occurs during the policy period." JA.59. But, they also include an endorsement titled "COVERAGE LIMITATION – LEAD CONTAMINATION." JA.56-58. In Section I, titled "EXCLUSIONS," the endorsement excludes coverage for "(3) 'bodily injury' … arising out of the ingestion, inhalation, absorption of, or exposure to, lead, lead-paint or other lead-based products of any kind, form or nature whatsoever." JA.56.

The endorsement creates an exception to that exclusion in Section II, titled "COVERAGE LIMITATION." *Id.* At paragraph (a), it provides coverage for "'bodily injury' … arising out of the Ingestion, Inhalation, absorption of, or exposure to lead, lead-paint or other lead-based products of any kind, form or nature whatsoever to which the insurance provided by this endorsement applies." *Id.* The exception is qualified in paragraph (b), which states:

> This insurance applies to "bodily injury" … only if:
>
> * * *
>
> (4)    For "bodily injury" a lead level in blood, bone or body tissue in excess of the "safe level" is first diagnosed by a State licensed physician or other State licensed health care provider during this policy period[.]

JA.57. The term "safe level" is defined to mean "10 micrograms of lead per deciliter of blood as prescribed by the Centers For Disease Control." JA.58.

Thus, under the exception to the exclusion of coverage for lead contamination liability, CX Re's policies could extend coverage to Levitas for Loyal's claims only if Loyal was first diagnosed with a lead level in excess of 10 micrograms per deciliter of blood during the policy period. Under Maryland law, Levitas bore the burden of proof on this issue. Under the facts of this case, neither he nor Loyal could possibly carry that burden.

**B.**    **If the insurer establishes that a claimed loss is excluded, the burden shifts to the insured to show an exception to that exclusion.**

The general rule, in Maryland and elsewhere, is that the insured has the initial burden to show that a claim is covered under the policy's insuring agreement. *Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 197 F. Supp. 2d 370, 376 (D. Md. 2002) (applying Maryland law); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. The Fund for Animals, Inc.*, ___Md. ___, No. 18, Sept. Term, 2016, 2017 WL 383453 at *10 (Jan. 27, 2017) (in discussing insurer's burden to show prejudice from insured's providing late notice of claim, acknowledging that "the insured bears the burden to prove it is entitled to coverage under the policy"). The burden then shifts to the insurer to show that the policy excludes coverage for the loss. *ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 798 (D. Md. 2008) (applying Maryland law). "However, if the insurer successfully establishes that the loss is excluded, the burden shifts to the insured to demonstrate that the damage falls within an exception to the exclusion." *Bao v. Liberty Mut. Fire Ins. Co.*, 535 F. Supp. 2d 532, 535 (D. Md. 2008) (applying Maryland law).

In *Simkins Indus., Inc. v. Lexington Ins. Co.*, 42 Md. App. 396, 397 (1979), the court applied this burden-shifting analysis implicitly. In that case, the insured maintained that two insurance policies covered damage to its power plant caused by a flood. The policies excluded coverage for flood damage, except "liability

[was] specifically assumed for loss or damage by fire, sprinkler leakage, explosion, or accident, … resulting from flood[.]" *Id.* at 400. In affirming summary judgment for the insurers, the court explained that the "exclusionary clause" at issue was "no more than an exception to the broad exclusion of flood damage from coverage under the policy," *id.* at 403, and the insured did not show that an exception to the exclusion applied. *Id.* at 406. The burden-shifting analysis squares with Maryland law because it aligns with the insured's obligation to show coverage in the first instance. *See Harford County v. Harford Mut. Ins. Co.*, 327 Md. 418, 436 (1992) (explaining that "[t]he burden to show that property damage occurred within the coverage of the policies is, of course, upon the insured").

Courts in other jurisdictions have applied the burden-shifting analysis expressly. For example, in *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 679 N.E.2d 1044, 1048-49 (N.Y. 1997), the court noted that, once the insurer satisfies its burden of proving the application of a policy exclusion, "the burden shifts to the insured to demonstrate a reasonable interpretation of the underlying complaint potentially bringing the claims within the … exception to exclusion[.]" The court affirmed the finding of no duty to defend because of the

"absence of any allegations in the underlying complaints" showing the exception to

the exclusion applied. *Id.*[2]

---

[2] The weight of authority is in accord. *See, e.g.*, *Modern Equip. Co. v. Cont'l W. Ins. Co.*, 355 F.3d 1125, 1128 (8th Cir. 2004) ("The burden then shifts back to [the insured] to prove, if applicable, any exception to the exclusion."); *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999) (same); *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997) (noting majority view that insured has burden to show exception to exclusion) (citing *Aeroquip Corp. v. Aetna Cas. & Sur. Co.*, 26 F.3d 893, 894-95 (9th Cir. 1994) (per curiam)); *Buell Indus., Inc. v. Greater N.Y. Mut. Ins. Co.*, 791 A.2d 489, 504 and n.21 (Conn. 2002) (citing cases); *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997) ("[T]he majority rule is that a policyholder seeking coverage under an exception to a policy exclusion bears the burden of proving its entitlement."); *Amos ex rel. Amos v. Campbell*, 593 N.W.2d 263, 266 (Minn. Ct. App. 1999) (insured bears burden of proving exception to exclusion; "[t]he reasoning is that the exception 'restores' coverage, and the insured bears the ultimate burden of proving coverage"); *Travelers Cas. & Sur. Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 476-77 (Mont. 2005) ("'[W]hen a policy contains an exception within an exception, the insurer need not negative the internal exception; rather, the [insured] must show that the exception from the exemption from liability applies.'") (quoting with approval from 19 G. Couch, Couch on Insurance 2d § 79.385, 338 (1983)); *Duncan v. Cuna Mut. Ins. Soc'y*, 614 S.E.2d 592, 594 (N.C. Ct. App. 2005) ("[T]he burden is upon the insured to prove the existence of an exception to the exclusion which is applicable to restore coverage.") (citations omitted); *Helena Chem. Co. v. Allianz Underwriters Ins. Co.*, 594 S.E.2d 455, 460 n.5 (S.C. 2004) ("it is the insured who bears the burden of proving an exception to the exclusion"); *Gilbert Texas Constr., L.P. v. Underwiters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) ("If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage.").

Loyal's statement in her brief that "virtually all" of these cases relate to the pollution exclusion found in the 1973 Commercial General Liability Form is simply incorrect. Appellant's Brief at 22. To the contrary, nearly half of the above cases deal with other forms of coverage. *See, e.g.*, *Modern Equip. Co.*, 355 F.3d at 1128 (claim against commercial general liability policy for collapse of storage racks in warehouse); *Federated Mut. Ins. Co.*, 197 F.3d at 723 (construction defect claim against commercial general liability policy); *Amos*, 593 N.W.2d at 266

Loyal's argument to the contrary is verbal sleight of hand. In *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 840 F. Supp. 390, 392 (W.D. Pa. 1993), contrary to Loyal's suggestion in her brief at 16, the court actually said:

> In Pennsylvania, the burdens in a dispute over an insurance policy exclusion, and an exception to that exclusion, are divided as follows: **the insurer has the burden of proving the exclusion; the insured has the burden of proving the exception to the exclusion.** In other words, and quite sensibly, whoever wants something – either coverage or an escape from coverage – must prove that it is legally entitled to it.

(Emphasis added) (citing *N. Ins. Co. v. Aardvark Assocs., Inc.*, 942 F.2d 189, 194-95 (3d Cir. 1991)). Based on that analysis, the court granted partial summary judgment for the insurer. *Id.*

Indeed, all of the cases Loyal cites applying the minority rule are distinguishable. As Loyal admits in her brief at 20 n.6, the federal authority she cites predicting state law to the contrary has largely been rejected by the state

---

(errors and omissions policy in case involving assault); *Duncan*, 614 S.E.2d at 594 (life insurance policy); *Gilbert Tex. Constr.*, 327 S.W.3d at 124 (contractual liability exclusion in commercial general liability policy). And, other courts have not hesitated to apply the burden-shifting analysis to other forms of coverage. *See, e.g., Young Sook Pak v. Alea London Ltd.*, No. 08-0824, 2009 WL 2366549, at *7 (M.D. Pa. July 30, 2009) (coverage for collapse of wall excluded, except in specified circumstances); *TIG Specialty Ins. Co. v. Koken*, 855 A.2d 900, 915-16 (Pa. Commw. Ct. 2004) (directors and officers policy excluded derivative actions, except in specified circumstances); *Am. W. Home Ins. Co. v. Lovedy*, No. 06-8, 2006 WL 3740874 at *8 (E.D. Tenn. Dec. 15, 2006) (applying exclusions in commercial general liability policy with respect to claims under Americans with Disabilities Act).

courts whose law was being predicted. *See, e.g.*, *N.Y. v. Blank*, 27 F.3d 783, 788-89 (2d Cir. 1994) (predicting New York law), *abrogation recognized by Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012) (citing *Northville Indus. Corp.*, *supra*); *New Castle County v. Hartford Accident & Indem. Corp.*, 933 F.2d 1162, 1181-82 (3d Cir. 1991) (predicting Delaware law) (rejected by, *e.g.*, *E.I. du Pont de Nemours & Co v. Admiral Ins. Co.*, 711 A.2d 45, 53 (Del. Super. Ct. 1995)).

This problem is deeper than Loyal lets on, however, as the federal decisions on which Loyal relies for statements of New Jersey and Illinois law also were based solely on the *New Castle County* court's erroneous prediction. *See Cont'l Ins. Co. v. Beecham, Inc.*, 836 F. Supp. 1027, 1042 (D.N.J. 1993); *Chemetron Invs., Inc. v. Fid. & Cas. Co. of N.Y.*, 886 F. Supp. 1194, 1200 (W.D. Pa. 1994). The Third Circuit itself later rejected its prediction of Delaware law in *New Castle County* as controlling its prediction of other states' law. *N. Ins. Co. of N.Y. v. Aardvark Assocs., Inc.*, 942 F.2d 189, 193-94, 195 (3d Cir. 1991) ("we conclude that the insured bears the burden of persuasion on this question under Pennsylvania law"). Moreover, other federal courts have reached the opposite conclusion of the *Chemetron Invs.* court as to Illinois law. *See Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 347-48 (7th Cir. 2010) (with respect to intellectual property exclusion to commercial general liability policy, "[i]nsureds,

in turn, have the burden to prove that an exception to an exclusion restores coverage.").

And, in *Ass'n of Apt. Owners of Imperial Plaza v. Fireman's Fund Ins. Co.*, 939 F. Supp. 2d 1059, 1070 (D. Haw. 2013), the court interpreted an "all risks" policy, which is a different analysis from that applicable to the commercial general liability policies here, and does not even represent a universal view with respect to all risks policies. *See Ruede v. City of Florence*, 220 P.3d 113, 116-17 (Or. Ct. App. 2009) (in construing all risks policy, noting that "[i]t is plaintiffs' burden to establish that their claim is within an exception to an exclusion.").

Loyal does not in any way address the *Simkins Indus.* court's analysis, which placed the burden on the insured to show the applicability of an exception contained within the same provision as an exclusion. 42 Md. App. at 400, 406. This analysis is directly at odds with Loyal's citation to *U.S. Fid. & Guar. Co. v. Morrison Grain Co.*, 734 F. Supp. 437, 443 (D. Kan. 1990). On a question of Maryland law, the Maryland Court of Special Appeals' reasoning in *Simkins Indus.* clearly takes precedence.

The District of Maryland has adopted the burden-shifting analysis in several cases applying Maryland law. In *CX Reinsurance Co. Ltd. v. Camden Mgmt. Servs., LLC*, No. WMN-14-180, 2014 WL 5510914 (D. Md. Oct. 30, 2014), which presented substantially the same factual scenario and policy terms as this action,

Judge Nickerson found that "[t]here is a three-part burden-shifting scheme employed when determining whether an action is covered": (i) "the insured must demonstrate that the claim is covered under the policy's insuring agreement"; (ii) "the insurance company must show that the policy excludes coverage for the loss"; and (iii) "then the burden shifts to the insured to prove the applicability of the exception to [the] exclusion." *Id.* at *2.

More recently, Judge Hollander agreed, again on substantially the same factual scenario and policy terms. Citing Judge Nickerson's opinion in *Camden* and Judge Motz's opinion in *Bao*, Judge Hollander noted that, "if the insurance company prevails in showing that the claim is excluded, the insured must prove the applicability of an exception." *CX Reinsurance Co. Ltd. v. Heggie*, No. ELH-15-1674, 2016 WL 6025488 at *8 (D. Md. Oct. 14, 2016). *See also Landmark Realty, Inc. v. Great Am. Ins. Co.*, No. JKS-10-278, 2010 WL 5055805 at *3 (D. Md. Dec. 3, 2010) (applying Maryland law) (quoting *Bao*, 535 F. Supp. 2d at 535).

Although Loyal unfairly denigrates these opinions as "not the product of a litigated process," Appellant's Brief at 19 n.5 and 29 n.12, this ignores the fact that the district judges and magistrate judge who authored them undertook their own independent analyses and issued full and well-reasoned opinions on the issue. Indeed, Judge Hollander discussed the district courts' obligation under *Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 409 n.8 (4th Cir 2010), to "thoroughly

analyze[]" unopposed motions for summary judgment.  *Heggie*, 2016 WL 6025488

at *5.  The opinions issued by Judges Nickerson and Hollander bear all the

hallmarks of such thorough analysis.

The *Northville Indus. Corp.* court cogently explained the policy rationale for

the burden-shifting approach:

> Shifting the burden to establish the exception conforms
> with an insured's general duty to establish coverage
> where it would otherwise not exist, provides the insured
> with an incentive to strive for early detection that it is
> releasing pollutants into the environment and
> appropriately places the burden of proof on the party
> having the better and earlier access to the actual facts and
> circumstances surrounding the discharge.

679 N.E.2d at 1048-49. Loyal attempts in vain to distinguish this policy analysis.

She cannot possibly contend that CX Re has better or earlier access than the

insured or herself to the actual facts and circumstances surrounding her alleged

injuries. She forgets that coverage in this case is determined by her own lead

testing results: whether she was first diagnosed with a blood lead level in excess of

the defined safe level during the policy period.

This information is plainly less available to CX Re than to its insured, who

can obtain it in discovery in the lead paint action. Indeed, the pertinent information

could be difficult or impossible for an insurer to obtain. It is confidential medical

information subject to the Health Insurance Portability and Accountability Act.

Placing the burden on CX Re of proving the application of the exception could,

therefore, mean that the underlying lead paint plaintiff could defeat CX Re's contractual right to limit coverage by simply refusing to disclose lead testing results. Loyal offers no reason to believe that CX Re and State Real Estate intended such a perverse result.

**C.    Neither Section II(.a) of the lead contamination endorsement nor the endorsement as a whole was an "independent insuring agreement."**

Although Loyal claims that Section II(a.) of the lead contamination endorsement was itself an "independent insuring agreement," Appellant's Brief at 16-17,[3] this is plainly not true. Though Loyal offers no definition of "independent insuring agreement," one can only assume that she means an agreement that can stand on its own and extends insurance against some form of risk. But Section II(a.) cannot stand on its own. Rather, it is wholly dependent on other sections of the endorsement and the policy and is nothing other than a narrow exception to Section I(3)'s general exclusion of coverage for lead contamination claims.

Section I of the endorsement, aptly titled "EXCLUSIONS," identifies several categories of losses to which "[t]his insurance does not apply." JA.56. The

---

[3] Loyal's only authority for this point is the conclusory affidavit of her proffered expert. As CX Re pointed out to the district court, the affidavit does not meet the requirements of Fed. R. Evid. 702, because it was not based on "sufficient facts and data" and "reliable principles and methods" that were reliably applied. At most, Loyal's expert purported to state an industry custom. CX Re and its insureds were free to agree to exceptions different from what Loyal's expert may consider customary. And, as explained fully *infra*, the district court properly declined to consider extrinsic evidence of any kind, including the proffered expert opinion, because the policy language is unambiguous.

term "[t]his insurance" obviously refers to the insurance provided by the Commercial General Liability Coverage Part of the policy. Among the exclusions in Section I, subsection (3) excludes coverage for "'Bodily injury' … arising out of the ingestion, inhalation, absorption of, or exposure to, lead, lead-paint, or other lead-based products of any kind, form or nature whatsoever." *Id.*

Section II of the endorsement, titled "COVERAGE LIMITATION," establishes conditions under which an exclusion in Section I "does not apply" − that is, exceptions to the exclusion. *Id.* In particular, Section II(a.) provides that CX Re will pay "damages because of 'bodily injury' or 'property damage' arising out of the Ingestion, Inhalation, absorption of, or exposure to, lead, lead-paint or other lead-based products of any kind form or nature whatsoever **to which the insurance provided by this endorsement applies**." *Id.* (emphasis added).

Loyal's contention that Section II(a.) is an independent insuring agreement fails immediately, because the coverage it provides cannot be determined without terms stating the types of "bodily injury" and "property damage" to which the insurance provided by the endorsement applies. Those terms are not found in the supposedly "independent" Section II(a.). Rather, the types of "bodily injury" and "property damage" are specified in Section II(b.). The definitions of "bodily injury" and "property damage" are supplied in Section V of the Commercial

General Liability Coverage Form. JA.67, 70. For these reasons, Section II(a.) cannot function independently.

Taken as a whole, Section II thus states the terms of two exceptions to the exclusions in Section I. Loyal's fallback contention, that Section II(a.) states an exception but Section II(b.) states a "a further exception to that exception to an exclusion," Appellant's Brief at 18, is nonsense for the same reason. Sections II(a.) and II(b.) must be read together and, so read, establish two exceptions to the exclusions established in Section I.

Even if Loyal persuades this Court that Section II, taken as a whole, resembles an insuring agreement, Loyal will only have succeeded in showing that CX Re's insured must bear the burden of proving that the claims in the underlying action satisfy each of Section II(b.)'s elements, as part of the insured's indisputable burden of proof that the underlying claims against him were covered to begin with.

**D.    The burden here ultimately shifted to Levitas to show that an exception to the lead contamination exclusion applied, and neither Levitas nor Loyal met (or could meet) that burden.**

CX Re has no duty to defend or indemnify Levitas, given the policy terms and Loyal's allegations in the lead paint action. The policies exclude coverage for bodily injury caused by exposure to lead, except where a lead level in excess of the defined "safe level" is "first diagnosed" during the policy period. Because Levitas

(and indeed, Loyal) have not shown and cannot show that exception applies, the policies do not cover the alleged bodily injury.

### 1. Levitas can carry State Real Estate's initial burden to show the claim is covered under the policies' insuring agreement.

As CX Re stated in the district court, under the insuring agreement contained in Section I(1)(a) of the policies, Loyal's complaint is a "suit" seeking damages for "bodily injury" that allegedly took place within the "coverage territory" during the policy period. These allegations potentially bring Loyal's complaint within the coverage available to the insureds, Levitas and State Real Estate. *Brohawn*, 276 Md. at 407. State Real Estate's tender of the claim to CX Re thus satisfied the insured's initial burden to show that the claim falls within the policies' insuring agreement. Accordingly, the burden shifted to CX Re to prove that the policies exclude coverage for the loss. *See, e.g.*, *ACE Am. Ins. Co.*, 570 F. Supp. 2d at 798.

### 2. CX Re carried its burden of showing that the lead contamination endorsements in the policies exclude coverage for Loyal's claims against Levitas.

Under the exclusion contained in the lead contamination endorsements, the policies "do not apply" to Loyal's claims because her bodily injuries allegedly arose out of the ingestion and consumption of "paint chips and dust containing lead and lead pigments." JA.24-25. The burden of establishing coverage therefore shifted back to Levitas to establish that an exception to this exclusion applies to Loyal's claims. *See, e.g.*, *Bao*, 535 F. Supp. 2d at 535.

### 3.    Levitas (and Loyal) could not and did not carry the burden of showing that an exception to the exclusion applies.

The potentially applicable exception to the broad exclusion in the lead contamination endorsement required Levitas to demonstrate that Loyal was "first diagnosed" with a lead level in excess of the "safe level" of 10 micrograms of lead per deciliter during one of the policy periods of August 1, 1997 to August 1, 1998 or August 1, 1998 to August 1, 1999. Neither Levitas nor Loyal met that burden.

Nor could they. In Loyal's answers to interrogatories in the lead paint action, which she submitted in support of her cross-motion for summary judgment in this action, she stated that she was diagnosed with blood lead levels of "3" in 1996 and "6" in 1998, JA.180, and that she "was found to have blood lead levels in excess of 5 μg/dL" during the time she resided at the property. JA.184. Loyal has never contended that she was "first diagnosed" with a lead level in excess of 10 micrograms of lead per deciliter of blood during one of the policy periods.

Loyal's contention in the district court that summary judgment was premature because she needed time to conduct more discovery in the lead paint action as to her own lead test result history was absurd. That she continues to press this point on appeal, Appellant's Brief at 30-32, now months after she litigated the lead paint action to a favorable judgment on December 1, 2016, *see id.* at 5 n.1, is inexplicable. Loyal still offers no evidence of test results showing a lead level in

excess of 10 micrograms per deciliter of blood, at any time, and, indeed, admits in her brief that her lead level "never reached 10 μg/dL." *Id.* at 6.

**4.    If no exception to the exclusion applies, CX Re's policies do not provide coverage to Levitas against Loyal's claims.**

As the insured failed to meet its burden to establish an exception, the only permissible conclusions are that: (i) the lead contamination exclusion applies; (ii) coverage under the policy "does not apply"; and (iii) no insured is entitled to indemnity from CX Re for any liability they may be determined to have in connection with the lead paint action, and, for the same reason, no insured is entitled to a defense from CX Re in connection with the lead paint action. The district court properly granted summary judgment for CX Re. JA.343.

**E.    The district court construed the plain terms of Section II(b.) of the lead contamination endorsement in the only reasonable way.**

The district court properly rejected Loyal's alternative construction of the lead contamination endorsement, because it was not reasonable.

Section II(b) of the lead contamination endorsement (the exception to the exclusion) provides:

> (b.) This Insurance applies to "bodily injury" and "property damage" only if:
>     (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>     (2) The "occurrence" is not before the beginning of the Policy Period shown in the Declarations of this policy; and

> (3) The "property damage" first occurs during this policy period; or
> (4) For "bodily injury" a lead level in blood, bone or body tissue in excess of the "safe level" is first diagnosed by a State licensed physician or other State licensed health care provider during this policy period[.]

JA.57. The district court properly construed this passage as follows:

> [O]ne finds the limitations of subsections 1, 2, and 4 applicable to bodily injury and the limitations of subsections 1, 2, and 3 applicable to property damage. Since the endorsement applies to both bodily injury and property damage, it makes sense to put the coverage limitations for both in one section, with the understanding that some differentiation between the coverage limitations for bodily injury and property damage necessitates separate qualifiers for each of the types of liability coverage. What applies to property damage in subsection 3 is obviously inapplicable to bodily injury, and the reverse is true for what applies to bodily injury in subsection 4.

JA.341-42. Thus, the court concluded: "the question that must be answered is whether Loyal has shown she meets the coverage limitations of Section II and, in particular, subsections 1, 2, and 4." JA.342.

Loyal claimed, as she does here, that Section II(b) of the lead contamination endorsement provides two paths to coverage for bodily injury: "either facts supporting elements (1)–(3), as applicable, may trigger coverage, or facts supporting element (4) may trigger coverage, or both." Appellant's Brief at 26. Loyal's construction is fatally flawed in at least two respects: it requires the Court to ignore subsection 3, notwithstanding the conjunctive "and" that precedes that

section; and it relieves the insured's essential obligation of showing "bodily injury" occurring during the policy period.

Loyal's construction requires the person alleging coverage for bodily injury to establish subsections 1 **and** 2 **and** 3. Under her construction, subsection 3, "The 'property damage' first occurs during this policy period," becomes a necessary element of proof to establish coverage. But Loyal could never satisfy subsection 3, because she did not claim property damage. She shrugs this off in a footnote, saying only that "Element (3) concerns 'property damage' and is, accordingly, not applicable here. The underlying suit only seeks damages arising from 'bodily injury.'" Appellant's Brief at 27 n.9. In other words, Loyal insists on an unreasonable construction of the policy terms – that would not provide coverage against her claims – and then, to afford her coverage, demands that the Court disregard one of three elements that is joined to the other elements by a conjunctive "and." Engaging in this kind of gymnastics is the opposite of giving effect to the plain language of a policy's terms, as Maryland law requires.

Moreover, Loyal's construction would relieve the person alleging coverage for bodily injury from proving that the bodily injury had a temporal connection to the policy period. Under subsection 1, she would have to prove it was "caused by an 'occurrence' that takes place in the 'coverage territory,'" and under subsection 2, she would have to prove that that "'occurrence' is **not before the beginning** of the

Policy Period" (emphasis added), but she would not have to prove that the occurrence was **during** the policy period. Consequently, according to Loyal's construction, CX Re undertook to cover bodily injuries that occurred years or decades after the policy period. This also is untenable.

Loyal's tortured and muddy path to avoid having to satisfy subsection 4 did not comport with the plain, unambiguous language of the policy. *See, e.g.*, *Howell v. Harleysville Mut. Ins. Co.*, 305 Md. 435, 443 (1986) ("Where there is no ambiguity in an insurance contract the court has no alternative but to enforce the policy's terms."). The district court did not err in rejecting Loyal's construction in favor of the only reasonable construction: that Loyal must "show[] she meets the coverage limitations of Section II and, in particular, subsections 1, 2, and 4." JA.342.

## F.  The district court construed the plain terms of the definition of "safe level" in the only reasonable way.

The district court also properly rejected Loyal's alternative construction of the endorsement's definition of "safe level," because it, too, was not reasonable.

In order to prove the existence of coverage under the only reasonable reading of Section II(b) of the lead coverage endorsement, Loyal had to satisfy subsection 4: "For 'bodily injury' a lead level in blood, bone or body tissue in excess of the "safe level" is first diagnosed by a State licensed physician or other State licensed health care provider during this policy period." JA.57. The

endorsement defines "safe level" as "10 micrograms of lead per deciliter of blood as prescribed by the Centers for Disease Control." JA.58.

The district court correctly found, based on these unambiguous policy terms, that the controlling question under subsection 4 was: "did she [Loyal] first have a diagnosis of a lead level in excess of 10 micrograms per deciliter that took place in the coverage territory during the policy period but not before the beginning of the applicable policy period?" JA.342.

The reference to the Centers for Disease Control ("the CDC") is obviously nothing more than descriptive language. As Loyal admits, 10 micrograms per deciliter was the CDC's benchmark at the time the policies were issued. Appellant's Brief at 33-34. This reference point does not make the policy's use of "10 micrograms of lead per deciliter of blood" subject to any changing standards the CDC might publish fifteen, twenty, or more years after the policy was issued. Loyal's construction would create the potential for ever-expanding coverage that the parties never anticipated or intended. The policies provide no indication that the contracting parties intended that the policies would ever respond to alleged injuries of claimants with diagnosed lead levels of anything less than 10 micrograms per deciliter.

Nevertheless, Loyal claims that the definition of "safe level" renders the policy ambiguous and, thus, opens the door to discovery on the parties' intentions

in drafting the lead contamination endorsement and CX Re's claims history, as well as the admission of extrinsic evidence. She rests this claim of ambiguity on her representations that the CDC established its "level of concern" in 1960 and reduced it in 1985 and 1991 – twelve and six years before these policies were issued – and the CDC scrapped the "level of concern" formula in 2012 – fifteen years after the first of these policies was issued – in favor of an entirely new method of determining a "reference level" that is recalculated every four years.  Appellant's Brief at 33-35.

But this is relevant only if one ignores the policy's specific definition of the term "safe level" as "10 micrograms of lead per deciliter of blood" or inserts language into the policy such as "10 micrograms of lead per deciliter of blood **or such other level** as **may, from time to time, be** prescribed by the Centers for Disease Control **as 'safe' or as a 'level of concern' or a 'reference level' or other such metric**." (Emphasis added to show additions). Again, this form of gymnastics in no way comports with the objective theory of contract interpretation that Maryland law requires. *See, e.g.*, *Nationwide Mut. Ins. Co. v. Regency Furniture, Inc.*, 183 Md. App. 710, 722 (2009).

Conversely, Loyal's contention that, regardless of the policies' specific reference to 10 micrograms per deciliter, **any** diagnosed amount of lead in blood is unsafe (and on that basis exceeds the "safe level" under the policy) could **deprive**

insureds of coverage for lead paint claims. An insured faced with a claim of any diagnosed lead level predating the policy period could not prove "a lead level in blood, bone, or body tissue [of any amount] **is first diagnosed** … **during this policy period**." Again, Loyal offers no basis for concluding that the parties intended that low-level pre-policy period diagnoses would bar coverage for lead levels at or above the defined "safe level" of 10 micrograms per deciliter that are first diagnosed during the policy period. Yet Loyal's construction of the policies would require this perverse result.

Carried to extremes, Loyal's reading could even deny Loyal coverage. She was diagnosed with a blood lead level of 3 in 1996. JA.180. Accepting her premise that any diagnosed amount of lead in blood is unsafe, this would count as an elevated lead level diagnosed before the policies incepted. Under Loyal's reading, this would bar coverage even if she had been diagnosed with a blood lead level of 10 micrograms or greater during the policy period. The parties to the insurance contract obviously did not intend these absurd results.

The inclusion of a specific blood lead level – which was commonly accepted as the appropriate benchmark at the time the policies were issued – coupled with the absence of any indication whatsoever that the parties intended for the threshold level to be changed in the future by entities not parties to the insurance contract,

confirms that CX Re's and the district court's construction of the policies' definition of "safe level" is the only reasonable one.

### G. As the policy terms are unambiguous, extrinsic evidence – including expert testimony – is inadmissible, and discovery would have been pointless.

Loyal contends that the policy language here is "clear and unambiguous," Appellant's Brief at 25, but nonetheless offers expert testimony in support of her strained construction, and further claims that she should have been allowed discovery to adduce extrinsic evidence as to the contracting parties' intent. She cannot have this both ways and, moreover, these contentions are contrary to Maryland law. The district court properly declined to consider the proffered expert testimony and properly declined to defer summary judgment pending discovery.

Maryland courts do not consider any form of extrinsic evidence in interpreting an insurance policy unless the policy is facially ambiguous. *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674, 686 (D. Md. 2013). *See also Cheney*, 315 Md. at 767 ("[W]e hold that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole. **In the event of an ambiguity, however**, extrinsic and parol evidence may be considered.") (emphasis added). As the Maryland Court of Appeals explained in more detail in *MAMSI Life & Health Ins. Co.*:

> When the terms of a contract are ambiguous, courts look
> to extrinsic sources to ascertain the meaning of the terms.

> **If the terms are unambiguous, the court may construe the insurance contract as a matter of law.** A contract term is determined to be ambiguous if "a reasonably prudent person" would understand the term as susceptible to more than one possible meaning.

375 Md. at 279 (citations omitted) (emphasis added). Extrinsic evidence may not be considered in determining whether the terms are ambiguous, because "otherwise a court could consider extrinsic evidence to determine whether to consider extrinsic evidence, which is absurd." *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 421-22 (2014).

As set forth above, the policy language at issue in this case is not ambiguous, because it was susceptible of only one reasonable construction. The Court of Appeals also has explained:

> A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning. A contract is not ambiguous simply because, in litigation, the parties offer different meanings to the language. It is for the court, supposing itself to be that reasonably prudent person, to determine whether the language is susceptible of more than one meaning.

*Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 751 (2007) (internal quotations and citations omitted). Loyal's creative but unreasonable (and clearly litigation-driven) policy constructions cannot create ambiguity where none exists.

The district court followed the correct approach in this case, declining to consider Loyal's proffered expert testimony because "[t]he interpretation of the insurance policy is a question of law to be decided by the Court." JA.345 (citing *Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1242 (4th Cir. 1987)). In *Forrest Creek*, this Court affirmed a district court's decision to exclude expert opinion in interpreting a contract, because "the … agreement speaks for itself, and its proper interpretation is a question of law." *Id.* Moreover, even if extrinsic evidence could have been considered, the proffered affidavit did not meet the requirements of Fed. R. Evid. 702, because it was not based on "sufficient facts and data" and "reliable principles and methods" that were reliably applied. At most, Loyal's expert purported to state his view of an industry custom. There was no evidence that CX Re and its insureds intended to follow any industry custom – indeed, Loyal's expert also opined that the lead contamination endorsement "is a non-standard insurance coverage form" containing "non-standard wording" that "is unique to CX Re." JA.192. CX Re and its insureds were free to agree to exceptions different from what Loyal's expert may consider customary.

There also was no reason for the district court to defer ruling on summary judgment to allow Loyal to take discovery as to CX Re's "intent" in drafting the policy or the way CX Re has dealt with other claims implicating similar policies in the past. This would have amounted to nothing other than a fishing expedition.

Without ambiguity (which did not exist here), Maryland law does not permit a court to consider extrinsic evidence in its interpretation of the policy. *See, e.g.*, *Calomiris v. Woods*, 353 Md. 425, 437-39 (1999) ("We have frequently barred the admission of extrinsic evidence when the written contractual language is unambiguous.") (citing cases). As any evidence that Loyal sought in discovery would have been inadmissible, discovery would have been pointless and inappropriate.[4]

For the same reasons, Loyal's reliance on extrinsic evidence pulled from the Internet – including from the websites of the CDC and Connecticut's State Department of Education – as well as publications by several individuals concerning the dangers of lead exposure, Appellant's Brief at 33-36, should not be considered. As explained above, because the terms of the policies are unambiguous, extrinsic evidence is inadmissible. Even if extrinsic evidence were admissible, however, this evidence would not be, because it sheds no light at all "on the intentions of the parties at the time of the execution of the contract." *See*

---

[4] Loyal's citation of authority on this point is misleading. In *Alcolac, Inc. v. St. Paul Fire & Marine Ins. Co.*, 716 F. Supp. 1541, 1543 (D. Md. 1989) (applying Missouri law), the court hypothesized that, "[i]f there were, for example, issues of fact as to policy language interpretation that required extrinsic evidence to be considered, discovery might be appropriate." The court explained, however, that "[t]here are … no such issues raised by the instant motions, as analyzed below, because the Court's decision turns on policy language defining 'occurrence' that is, beyond any doubt, present in the policies and as to which there is no material factual dispute." *Id.*

*John L. Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327 (2010). Statements by the CDC or pieces published many years after these insurance contracts were entered into cannot possibly be probative of the parties' intent at the time of execution. And, the publications referenced at Appellant's Brief 34 n.13 & 14 were not even presented to the district court. *See, e.g.*, *Hill v. Trustees of Indiana Univ.*, 537 F.2d 248, 251 n.2 (7th Cir. 1976) (declining to consider facts presented for the first time on appeal because an appellate court is "restricted to the facts presented in the record before [it]"). None of this evidence should be considered here.

### H.    A state trial court's decision in an unrelated case is not relevant.

Finding no other authority to support her unreasonable construction of the policy language, Loyal asks this Court to consider the three-page order of a state trial court in an unrelated case, *Robinson v. CX Reinsurance Co., Ltd.*, as persuasive authority, as well as over 100 pages of irrelevant argument of counsel submitted in that case. That decision, which remains pending on appeal, is neither proper authority nor in any way persuasive. [5]

---

[5] Loyal moved in this Court for leave to file "additional materials" with her opening brief, consisting of 108 pages of the record from the Circuit Court for Baltimore City in *Robinson v. CX Reinsurance Co., Ltd.*, Case No. 24-C-14-005676. Doc. No. 18. CX Re timely opposed that motion on January 19, 2017 and, on January 20, 2017, this Court deferred ruling on the motion pending assignment of the case to a panel for review on the merits. CX Re maintains its opposition and requests that Loyal's motion be denied.

The trial court's three-page decision in *Robinson* offers no reasoning and does not illuminate the issues presented in this appeal. Moreover, a decision of a state trial court would never be binding on Maryland's appellate courts, and Maryland's appellate courts would not consider such decision as even persuasive authority. *See, e.g.*, *Dep't of Health & Mental Hygiene v. Dillman*, 116 Md. App. 27, 41-42 (1997) (striking portion of brief and appendix citing an opinion of the Circuit Court for Allegany County, Maryland). This is especially true when that decision remains pending on appeal to the Maryland Court of Special Appeals. In predicting the course the Maryland Court of Appeals might take if confronted with the issues raised in this appeal, this Court should not consider authority that Maryland's appellate courts would not themselves consider.

This Court has itself noted that state trial court decisions are of limited persuasive value and may be considered only "to provide some light upon the subject," if there is no binding precedent and after consideration of, "among other things, canons of construction, restatements of the law and treatises that are regularly applied by the courts of the state and whose use for a particular purpose is approved by the state's highest court, recent pronouncements of general rules or policies by the state's highest court, or even that court's well considered dicta." *Liberty Mut. Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992);

*see also Wells v. Liddy*, 186 F.3d 505, 527-28 (4th Cir. 1999) (citing *Liberty Mut.*).

Professors Wright and Miller agree, noting:

> State trial court decisions are treated somewhat differently and, quite naturally, with somewhat less deference than is given to state appellate courts. They are entitled to consideration as an indication of what state law is, **but in and of themselves they are not controlling on the federal courts, especially if they are not regarded as precedents within the state itself**.

19 C.A. Wright & A.R. Miller, *Federal Practice and Procedure* § 4507 at 152-53 (3d ed. 2016) (footnote omitted) (emphasis added).

The trial court's three-page decision in *Robinson*, with no supporting analysis, stands in stark contrast to the well-reasoned opinions of the district court in *Heggie*, 2016 WL 6025488 at *9 ("[the insured] has failed to meet its burden of production; there is no showing whatsoever that [the tort claimant] was first diagnosed with a lead level above 10 micrograms per deciliter of blood, the 'safe level,' at some time **during the term** of the Policies") (emphasis in original); and *Camden*, 2014 WL 5510914 at *3 ("There is nothing to support a conclusion that any measurements of [the tort claimant]'s blood were taken by a licensed physician during the policy period, or that there were measurements in excess of ten micrograms."), both of which applied Maryland law and are in line with the district court's decision in this case. This Court should afford the trial court's decision in *Robinson* no deference.

## II. The district court should have granted CX Re's request for dismissal.

Alternatively, if this Court finds that the district court's decision to grant CX Re summary judgment was improper, it should reverse the district court's decision to deny CX Re's request for dismissal under Fed. R. Civ. P. 41(a)(2).

### A.    The action became moot when the insurance policies were rescinded.

CX Re moved to dismiss because the insurance policies it issued to State Real Estate had been rescinded as void *ab initio* in light of Levitas' material misrepresentations on his application for insurance. This was part of a confidential settlement between CX Re and Levitas in the rescission action. As the policies had been rescinded, they no longer provided coverage to any insured against any claims, including Loyal's. Without any coverage, there could no longer be a coverage dispute, and this action was (and is) moot and should have been dismissed.

Loyal responded by claiming that she was an intended third-party beneficiary of the insurance contracts between CX Re and State Real Estate and, therefore, she had the right to challenge the settlement agreement between CX Re and Levitas as being unenforceable. The district court rejected that claim, finding that "Loyal has failed to show she is a third-party beneficiary of the policy." JA.334. Nevertheless, the court reasoned that, "[e]ven if Loyal could be considered a third-party beneficiary, she would still be 'subject to the same defenses against

the enforcement of the contract, as such, as exist between the original promisor and promisee.'" JA.334 (citation omitted). The court concluded that there was not "clear evidence of a valid defense of unenforceability due to material misrepresentation" and, therefore, "the Court has no basis for applying that same defense to Loyal. Thus, the motion to dismiss will be denied." JA.335.

In other words, despite its correct conclusion that Loyal **was not** a third-party beneficiary to the insurance policies, the court denied CX Re's motion to dismiss based on lack of evidence of a defense that could apply only in the event that Loyal **were** a third-party beneficiary. This was illogical and, under the circumstances, an abuse of discretion. This action became moot as soon as the policies were rescinded, and the court should have dismissed on that basis. *See, e.g.*, *U.S. v. Juvenile Male*, 564 U.S. 932, 936 (2011) (per curiam) ("It is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'").

**B.    Loyal was not an intended third-party beneficiary and, therefore, had no standing to enforce the insurance policies CX Re issued to State Real Estate.**

The district court correctly found that Loyal was not an intended third-party beneficiary of the insurance contract between CX Re and State Real Estate. At common law, only a party could sue to enforce rights under a contract. *120 West Fayette St., LLP v. Mayor & City Council of Baltimore*, 426 Md. 14, 35 (2012).

Maryland courts have expanded this common law rule to permit a "third-party beneficiary" to enforce the terms of a contract that was **intended** to benefit him or her. *Id.* For a third party to have rights against the promisor, "'it must clearly appear that the parties intended to recognize [the third party] as the primary party in interest and as privy to the promise.'" *Shillman v. Hobstetter*, 249 Md. 678, 687 (1968) (quoting *Marlboro Shirt Co. v. Am. Dist. Tel. Co.*, 196 Md. 565 (1951)); *120 West Fayette St.*, 426 Md. at 34. The benefit must be both direct and intended: "In order to recover it is essential that the beneficiary shall be the real promisee; *i.e.*, that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit." *Lovell Land, Inc. v. State Highway Admin.,* 408 Md. 242, 261 (2009) (internal quotations and citations omitted).

Absent clear evidence of such intent, a third party is, at most, an "incidental beneficiary." *Shillman*, 249 Md. at 688. An incidental beneficiary is one who benefits from a contract even though the contracting parties did not specifically intend or plan to benefit the third party. *Id.*; *Parlette v. Parlette*, 88 Md. App. 628, 638 (1991). An incidental beneficiary has no enforceable rights against the promisor or the promisee. *Id.*

Loyal is merely an incidental, rather than an intended, beneficiary of the policies. She was not identified on the policies in any way, much less as a

beneficiary of any kind, and the language of the contract is the primary source for determining whether the contracting parties intended a third party to have standing to enforce the contractual provisions. *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 205 Md. App. 636, 654 (2012), *aff'd* 432 Md. 292 (2013); *Volcjak v. Wash. County Hosp. Ass'n*, 124 Md. App. 481, 509 (1999); *see also Shillman*, 249 Md. at 688 ("In determining the intention of the parties, the language of the instrument is the primary source.").

Although Loyal bore the burden of establishing that the policies were intended for her "direct" benefit, *Weems v. Nanticoke Homes, Inc.*, 37 Md. App. 544, 556 (1977), she ignored the policies' language, other than to claim that the policies "specifically identified" her by including on a Schedule of Locations the address of the building in which she used to live. This claim is hollow, as Loyal's name appears nowhere on the policies, she is not an insured, she never owned that building, and she moved into it only **after** the first of the policies incepted. Accordingly, she has no right or standing under Maryland law to disrupt CX Re's and Levitas' agreement to rescind the policies. Her attempts to cast aspersions on CX Re's motives, Appellant's Brief at 8-11, are inapt for the same reasons.

The district court correctly decided that "Loyal has failed to show she is a third-party beneficiary of the policy." JA.334.

**C.    As Loyal was not an intended third-party beneficiary and had no right to enforce the policies, the precise nature of the rescission was irrelevant.**

The district court's conclusion that Loyal was not a third-party beneficiary of the insurance policies should have been the end of its analysis. Instead, the court went on to consider whether the defense of the insurance policies' "unenforceability due to material misrepresentation" was valid and applied against Loyal. JA.335. Taking this second step was erroneous.

The district court accurately noted the legal principle that third-party beneficiaries are "subject to the same defenses against the enforcement of the contract, as such, as exist between the original promisor and promisee." JA.334 (quoting *Shillman*, 249 Md. at 690). But the court failed to realize that that principle becomes relevant only if the person seeking to enforce the contract is an intended third-party beneficiary. As Loyal was not an intended third-party beneficiary, she could not enforce the insurance contract in any event, whether it was enforceable between the original promisor and promisee or not. The nature or basis of the rescission agreement between CX Re and Levitas was, therefore, irrelevant.

**D.    The district court abused its discretion in grounding its decision on the absence of evidence of an irrelevant fact.**

Having found that Loyal was not an intended third-party beneficiary of the insurance policies, the only logical step for the district court to take was to grant

CX Re's request for dismissal under Fed. R. Civ. P. 41(a)(2). Loyal had no right to enforce the insurance policies, irrespective of the nature or adequacy of proof of their "unenforceability due to material misrepresentation." JA.335. "A district court abuses its discretion when it misapprehends or misapplies the applicable law." *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 235 (4th Cir. 2014). *See also, e.g.*, *In re Naranjo*, 768 F.3d 332, 347 (4th Cir. 2014) ("A district court abuses its discretion by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation.") (citation omitted).

In grounding its decision on the absence of "clear evidence of a valid defense" that, under settled law, should not have made any legal difference in its analysis, the district court committed legal error and, consequently, abused its discretion. As the policies provided no coverage for Loyal's claims against Levitas in any event, Loyal could not have been prejudiced by a dismissal. *See Davis v. USX Corp.*, 819 F.2d 1270, 1273 (4th Cir. 1987). This Court should reverse.

### E. The fact that Loyal obtained a judgment against the insured after the policies were rescinded as void *ab initio* changes nothing.

The only supporting authority Loyal cited in the district court was unavailing, and it remains so. In *Travelers Ins. Co. v. Godsey*, 260 Md. 669, 674 (1971), the Court of Appeals found that the underlying tort plaintiff, who had obtained a judgment against the insured tortfeasor, was a third-party beneficiary of

the subject automobile insurance policy and, as such, had a right, derivative of the insured's right, to have the insurer pay the judgment up to the policy limit. The key holding in *Godsey* is the unremarkable proposition that an insured's judgment creditor stands in the shoes of the insured and, thus, is subject to all of the defenses the insurer could raise, or could have raised, against the insured. *Id*. at 674-78.

The fact that Loyal has subsequently obtained a judgment by default against Levitas in the lead paint action changes nothing. For Loyal to have any rights at all with respect to the insurance policies, such rights must have vested prior to the completion of the settlement agreement between CX Re and Levitas. This could have happened only if Loyal had obtained a judgment against Levitas, or entered into an approved settlement with him, **prior to that time**. It is undisputed that she did not: the rescission action was settled and dismissed on July 13, 2016, JA.266, and judgment was entered in Loyal's favor in the lead paint action on December 1, 2016, *see* Appellant's Brief at 5 n.1.

In other words, Loyal still would claim to be a third-party beneficiary of a contract that no longer exists. "Before one can enforce a contract, … whether as a party to the contract or as a third-party beneficiary, there must be a contract to enforce." *Dickerson v. Longoria*, 414 Md. 419, 452 (2010) (rejecting third-party beneficiary claim as to contract that was not formed because agent entered into it without authority). A contract that is void *ab initio* "is not a contract at all, and all

parties, present and future, would be equally allowed to avoid the contract." *See Julian v. Buonassissi*, 414 Md. 641, 667 (2010) (citing Restatement (Second) of Contracts § 7 cmt. a (1981)) (explaining that deed that is void *ab initio* is void from inception, is of no legal effect, and does not protect even *bona fide* purchasers); *see also W. Md. R. Co. v. Blue Ridge Hotel Co.*, 102 Md. 307, 62 A. 351, 355 (1905) ("Such a contract will not be enforced by any species of action in a court of justice; being void ab initio, it cannot be made good by ratification, or by any succession of renewals, and no performance on either side can give validity to the unlawful contract, or form the foundation of any right of action upon it.") (citation omitted).

In *Higdon v. Lincoln Nat'l Ins. Co.*, No. ELH-13-2152, 2014 WL 6951290 (D. Md. Dec. 8, 2014), the court addressed a dispute between a life insurer, the trustee of a life insurance trust, and two daughters claiming entitlement to the proceeds of their deceased father's life insurance policy. Although the father had originally named his daughters as the policy's beneficiaries, before his death he changed the policy's beneficiary to the trustee and altered the priority of payments. The daughters claimed standing to sue the insurer for payment of the policy's proceeds as the original beneficiaries. The court disagreed, holding that the father's change had rendered the trustee the primary, intended beneficiary of the policy, and thereby made the daughters contingent, incidental beneficiaries with no standing to sue on the policy. *Id.* at *10. Like the daughters in *Higdon,* Loyal is not

an intended beneficiary of the policies. Rather, she is merely an incidental beneficiary whose rights (if any) to the policies' proceeds would have vested only if she had, prior to the settlement agreement in the rescission action, obtained a judgment against Levitas or entered into an approved settlement with him.

As the insurance policies CX Re issued to State Real Estate no longer legally existed at the time Loyal obtained a judgment against Levitas, there was no longer any insurance contract from which she could benefit as a third party.

## F.     The district court properly rejected Loyal's other arguments.

Loyal also claimed in the district court that the rescission of the policies should not affect her because she detrimentally relied on the possibility of coverage, that she somehow gained irrevocable rights under the policies because she was an infant when her lead testing was done, and that CX Re had somehow committed a "fraud" against her. The district court properly rejected all of these arguments, because they were wholly without merit.

The district court's agreement that "[n]one of [Loyal's] arguments has legal merit," JA.332, makes its denial of CX Re's motion to dismiss all the more curious. The court abused its discretion, and this decision should be reversed.

## Conclusion

For the foregoing reasons, this Court should affirm the district court's entry of summary judgment in CX Re's favor or, alternatively, reverse the district court's denial of CX Re's request for dismissal.

Respectfully submitted,

Dated: February 8, 2017
/s/     *Stuart M.G. Seraina*
Stuart M.G. Seraina
Louis P. Malick
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752–6030
sseraina@kg-law.com
lmalick@kg-law.com

*Counsel for Appellee/Cross-Appellant*
*CX Reinsurance Company Limited*

## Certificate of Compliance

1.      This brief complies with the type-volume limit of Fed. R. App. P. 28.1(e)(2)(B)(i) because, excluding the parts of the brief exempted by Fed. R. App. P.32(f), this brief contains 11,721 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/    *Louis P. Malick*
Louis P. Malick

## Text of Pertinent Rules

## Federal Rule of Civil Procedure 41. Dismissal of Actions

**(a) Voluntary Dismissal.**

**(1)** *By the Plaintiff.*

**(A)** *Without a Court Order.* Subject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute, the plaintiff may dismiss an action without a court order by filing:

**(i)** a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or

**(ii)** a stipulation of dismissal signed by all parties who have appeared.

**(B)** *Effect.* Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

**(2)** *By Court Order; Effect.* Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

**(b) Involuntary Dismissal; Effect.** If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule--except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits.

**(c) Dismissing a Counterclaim, Crossclaim, or Third-Party Claim.** This rule applies to a dismissal of any counterclaim, crossclaim, or third-party claim. A claimant's voluntary dismissal under Rule 41(a)(1)(A)(i) must be made:

**(1)** before a responsive pleading is served; or

**(2)** if there is no responsive pleading, before evidence is introduced at a hearing or trial.

**(d) Costs of a Previously Dismissed Action.** If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court:

**(1)** may order the plaintiff to pay all or part of the costs of that previous action; and

**(2)** may stay the proceedings until the plaintiff has complied.

## Certificate of Service

I HEREBY CERTIFY that on February 8, 2017, this brief was filed with the Court's CM/ECF system, which will serve an electronic copy on all counsel of record.


/s/     *Louis P. Malick*
Louis P. Malick